## TERRITORY OF HAWAII, BY C. S. HOLLOWAY, SUPERINTENDENT OF PUBLIC WORKS, *v.* C. E. COTTON, E. J. COTTON AND JAMES B. AGASSIZ, PARTNERS UNDER THE NAME OF COTTON BROTHERS & COMPANY.

EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

SUBMITTED JULY 30, 1906.        DECIDED SEPTEMBER 27, 1906.

FREAR, C.J., WILDER, J., AND CIRCUIT JUDGE DE BOLT
IN PLACE OF HARTWELL, J.

VERDICT—*held supported by evidence.*

> A verdict for $25,000 for the loss of a dredger through the alleged negligence of the defendants, who hired her from the plaintiff in the harbor of Honolulu and after using her there took her to the bar at the entrance to Pearl Harbor, where she was lost, is held supported by the evidence.

TRIAL JUDGE'S OPINION—*that verdict is contrary to evidence, what weight to be given to.*

> An opinion expressed by the trial judge that the verdict is against the evidence—in this case on the question of negligence—is not conclusive. In this instance it was expressed in a ruling that was set aside as beyond his jurisdiction, but, assuming that some weight might nevertheless properly be given to it, it cannot control in view of the inadequacy of the reasons given for it by the trial judge and the clear adequacy of the evidence to support the verdict.

ESTOPPEL—*none by consent upon condition when condition not per-
formed.*

Consent, if given, by the plaintiff to the defendants to take the
dredger to Pearl Harbor upon condition that the latter should give
an adequate bond for her safety, which condition was not per-
formed, would not estop the former from recovering damages for
the latter's negligence in taking her there, if that were negligence.

ID.—*none by mere knowledge and silence, when.*

The plaintiff would not be estopped by the mere knowledge of
its assistant superintendent of public works that the defendants
were to take or had taken the dredger to Pearl Harbor, if that
were negligence, and his failure to object—it not appearing what
authority he had in the matter or what knowledge he had as to
the rights of the defendants, and the latter, who had dealt with
the superintendent of public works, having full knowledge of the
extent of their rights.

ID.—*none by consent to use without specifying place of use, when.*

Consent, by contract, to the use of a dredger for a specified time
without specifying the place of use, does not necessarily permit
its use in any place however remote or dangerous.

ID.—*consent to do a thing is not consent to do it negligently.*

Consent, if given, to take the dredger to Pearl Harbor and use
her there would not estop the plaintiff from recovering damages
for the defendants' negligence, if any, in placing or keeping her
there under dangerous conditions.

NEGLIGENCE—*preponderance of evidence, proximate cause, failure to
provide against contingencies.*

Evidence tending to show that the defendants kept the dredger
without proper protection where she was liable to be swamped in
rough weather and that she was swamped in such weather, is suffi-
cient to support a verdict that she was lost through the negligence
of the defendants, even if there was no evidence of any special
negligence during the last two hours before she sank and even if
it was not negligence to place and use the dredger there in calm
weather and there was no available means of taking her to a place
of safety after rough weather arose, the defendants having failed
to provide such means.

HYPOTHETICAL QUESTION—*form of.*

A nautical expert may properly be asked whether it would be
"safe or prudent" to moor a dredger as described. It is not nec-
essary to ask instead whether such mooring would be such an act
as an ordinarily careful and prudent man would exercise as to his
own property under similar circumstances.

VALUE—*evidence of, at time of loss.*

> Evidence that the value of the dredger was $45,000 only eight months before she was lost and that during that time she had been used only in a quiet harbor and that she was then considered in sufficiently good order to be taken without further repairs for extensive use on a rough bar, would be sufficient to support a finding that she was worth $25,000 at the time she was lost—but there was direct evidence tending to show that she was worth that then.

### OPINION OF THE COURT BY FREAR, C.J.

This is an action for $25,000 for the loss of a dredger through the negligence of the defendants. The plaintiff obtained a verdict for the amount claimed and the defendants bring exceptions to this court. The principal exception is that taken to the verdict as contrary to the law and the evidence, and this is the only one that can be considered. See decision on motion to dismiss the bill of exceptions, ante, p. 608.

The theory of the plaintiff is that the dredger was swamped in consequence of being put or left in a dangerous position through the negligence of the defendants. The defendants contend that no negligence on their part was shown, that if there was any negligence the plaintiff is estopped by its consent or acquiescence from setting it up, and that the evidence does not show so great a loss as $25,000.

The dredger consisted of a rectangular flat-bottom scow 40 x 100 feet with a ladder extending in front 75 feet, and with the necessary machinery. She drew 6 or 7 feet of water. Her machinery was covered by a house made of 1 x 7 inch tongue and groove built 9 feet high on a coping six inches thick by sixteen inches high on the deck. The house had a pair of sliding doors 12 feet wide at the stern, and smaller sliding doors on the sides. It covered most of the deck, leaving spaces outside of it on the deck about 4 feet wide at the sides, six feet at the stern, eight feet at the bow to the ladder and fourteen feet on the sides of the ladder. The dredger was without means of self-propulsion.

By a contract made January 10, 1902, the plaintiff allowed the defendants the use of the dredger and appurtenances for one year upon their agreement to make complete repairs to the same in a sum of not less than $10,000, insure them for not less than $20,000 against loss or damage by fire and give a bond for $10,000 for their return in good working order. The repairs were made soon afterwards and from March to October the defendants used the dredger in the harbor of Honolulu. In July or August there was some talk, referred to more fully below, between Mr. Boyd, then superintendent of public works, who acted for the Territory in the matter, and the defendant Agassiz, who acted for the defendants, in regard to taking the dredger to the entrance of Pearl Harbor for use there before the expiration of the contract and also in regard to making another contract for continuing the use of the dredger there after the expiration of the contract already made. The defendants contemplated taking over from third parties a partially executed contract for dredging the bar at the entrance to Pearl Harbor. In September they took over that contract and on October 30 had the dredger towed from Honolulu harbor to a point off the entrance to Pearl Harbor by the tug Fearless, and there, because the Fearless was too deep to cross the bar, delivered to the tug Kaena, which took her to a position about 900 feet from the outer edge of the bar and 1000 feet from the inner edge and about two miles from land, where she was moored with her bow pointing seaward in about fifteen feet of water (one witness says 25 feet) by seven wire cables from 150 to 200 feet in length, which were made fast, some to dolphins consisting each of four posts 12 x 12 and some to anchors. The day on which she was taken to Pearl Harbor was specially calm—perhaps selected on that account for the purpose, as one witness seemed to think. Early on the morning of the 19th day thereafter she sank. During that period she was unable to do any work, apparently because, as one witness testified, the water, though not particularly rough until the last three days,

was too rough to take out from Pearl Harbor the pontoons, which were about 8 x 24 feet in size, and connect them and moor them in position. Eleven or twelve days before the dredger sank one of the scows 40 x 80 feet in size broke loose and went ashore. On the Saturday before the Tuesday on which the dredger sank there was a strong wind, said to amount to half a gale, from the ocean and a heavy swell, estimated at from six to twelve feet in height. On Sunday it was rougher. That evening one of the cables parted but was spliced together the next day. On Monday it was rougher still and towards noon a post in one of the dolphins and two cables broke allowing the dredger to swing around 150 to 200 feet with her bow towards the leeward side of the channel and her stern out square against the waves. Two six-inch Manila cables were then brought from shore to replace the broken wire cables. On Tuesday morning between 2 and 2:30 o'clock the dredger sank in about 15 feet of water,—one witness says sixteen at low tide by measurement. She may have drifted or been washed, before or after she sank, several hundred yards from where she was moored last. Other facts will be stated as we proceed.

The defendants contend that much weight should be given to the opinion expressed by the trial judge that the verdict was contrary to the evidence on the question of negligence, notwithstanding that his order granting a new trial upon that ground was set aside by this court as made without jurisdiction. See decisions ante, pp. 374, 445. The question being whether this court should set aside the verdict and grant a new trial, it is not precisely the same as it would be if it were whether this court should set aside an order for a new trial made by a trial judge within his jurisdiction. But, assuming that some weight might well be given to an opinion expressed by a trial judge even under such circumstances, such opinion, of course, would not be all-controlling, and in the present instance the reasoning of the trial judge, which is set forth at length, is so clearly insufficient to support his conclusions and the evidence is so

clearly of a nature to be passed on by the jury, that the verdict must be sustained.

The defenses, although not thus stated by the defendants, are substantially (1) that the plaintiff is estopped, by its consent to or acquiescence in the defendants' taking the dredger to Pearl Harbor, from setting up negligence on their part, and (2) that there was no negligence on their part, or at least that, if there was any, it was not the proximate cause of the loss.

In support of the defense of estoppel it is contended in the first place that the then superintendent of public works, Mr. Boyd, gave the defendants, through Mr. Agassiz, permission to take the dredger to Pearl Harbor. The only testimony upon this point is that of Mr. Boyd on one side and Mr. Agassiz on the other. Mr. Boyd in answer to the question, "Can you state whether or not permission was ever granted by you for them to take the dredger to Pearl Harbor," replied, "Not to my recol-·lection." Mr. Agassiz testified, "My recollection is that he did give me permission to take the dredger to Pearl Harbor." It was for the jury to say whose recollection was the better. The remaining testimony of these witnesses upon this point tends to show, in large part at least, that Mr. Boyd, when requested by Mr. Agassiz for permission to take the dredger to Pearl Harbor, declined to make any agreement at that time although he expressed a willingness to enter into an agreement on certain terms at a future time. The plaintiff contends, and with much support from Mr. Boyd's testimony, that Mr. Boyd told Mr. Agassiz that he would not enter into any agreement until the defendants had taken over the contract for dredging Pearl Harbor bar, which would be after his return from the mainland, for which he was about to depart, and that then he would permit the dredger to be taken to Pearl Harbor only on condition that further security in the form of a bond should be given for her safety, and that he would agree to allow the use of the dredger to be continued there after the expiration of the contract already made for a rental of not to exceed $1000 a month. The defendants contend that permission was given to take the

dredger to Pearl Harbor immediately without any further bond being given, and that the talk in regard to a further bond related solely to the contemplated use of the dredger under the proposed new contract after the expiration of the contract already made, and in support of this view they rely particularly on the clauses which we italicize in the following passage from Mr. Boyd's testimony: "The reason rental was talked of at the time, I proposed the rental to them AS IT WAS BEING TAKEN OUT OF THE HARBOR OF HONOLULU, TAKEN DOWN TO WORK IN PEARL HARBOR, on which they called my attention to the contract, they had an unexpired term, between three and four months, *and under that contract on an unexpired term they had a right to the use of the dredger,* so in the conversation that IF THEY GAVE THE GOVERNMENT A GUARANTEE OF THE RETURN OF THE DREDGER, *just as in the former contract,* that the PERMIS-·SION MAY BE GIVEN BY THE GOVERNMENT TO THEM TO TAKE THE DREDGER DOWN THERE, AND after the expiration of their term they were to pay a rental, I think it was $1000 a month." This passage is from the defendants' standpoint at best ambiguous, especially in view of the parts that we capitalize. Taking Mr. Boyd's testimony as a whole there is much to sustain the theory that he required an additional bond to be given upon taking the dredger to Pearl Harbor and for the reason that it was to be taken there, whether he thought it was to be taken there before or after the expiration of the contract already made. For instance, immediately after the passage just quoted Mr. Boyd testified: "After the expiration of the contract I was agreeable to it," that is, the rental of the dredger, "and also that upon being—the contract," that is, to dredge the Pearl Harbor bar, "being transferred to the Cotton Brothers, that the final agreement would be entered into with the government, in order to protect the government's property, that is, protect the dredger on its being taken out of the harbor to Pearl Harbor." A little earlier in his testimony he had said: Mr. Agassiz "asked me if I had any objection to the dredger being taken down there. I said I had no objection provided a proper safeguard was made for protecting the government's property."

The jury might well have found not only that no permission was given to take the dredger to Pearl Harbor, but also that the permission to be given at a future time was to be upon a condition as to the giving of a further bond, which was never complied with.

The defendants and the circuit judge seem to mistake a contemplated final agreement for a mere formal execution of a final agreement already made. Worse, they contend that even if the superintendent said that he would permit the dredger to be taken to Pearl Harbor only on condition that a further bond should be given for its safety, and even if that condition was not fulfilled, the plaintiff would be estopped from saying that using the dredger there was negligence, and they argue that it would not be any more negligent to use it there before permission was given to do so than it would be after that. They seem to confuse to some extent the idea of an estoppel on the part of the plaintiff from setting up negligence on the part of the defendants with the idea of absence of negligence as a matter of fact. If the plaintiff was willing that the defendants should use the dredger in a dangerous place or under dangerous conditions, provided the latter would assume the risk and provide for full compensation to the former in case of loss, the inference would be that the plaintiff considered that it would be negligent to use the dredger there rather than that it would not be negligent to do so, and such an agreement would not make that prudent on the part of the defendants which would otherwise be negligent in fact. Nor would willingness to make such an agreement work an estoppel. Otherwise, no one could set up as negligent anything whatever done to his property if he would be willing to have that done upon his being fully compensated or secured—which would be absurd. If in such case the consent of the plaintiff would estop it from bringing an action on the case if the dredger were lost and confine it to its right of action on the contract or the bond, it is still beyond dispute that a proposed agreement or conditional consent of that kind would not estop it from bringing its action on the case if the

defendants took the dredger and used it there without the agreement being made or without the performance of the condition imposed. Consent so conditioned would not be operative until performance of the condition.

The defendants contend next in support of the defense of estoppel that the plaintiff, through its superintendent, Mr. Boyd, or assistant superintendent, Mr. Campbell, had knowledge that the defendants took or were to take the dredger to Pearl Harbor and that that is sufficient to constitute an estoppel, or, as they and the circuit judge seem to think, is sufficient to take the character of negligence from what would otherwise be negligence. There is nothing whatever to indicate that Mr. Boyd had such knowledge. On the contrary soon after his talk with Mr. Agassiz he left the Territory and apparently did not return until after the dredger sank. And as to Mr. Campbell, the only evidence is that Mr. Agassiz on one occasion when calling on Mr. Campbell, then a very sick man, at his home, casually remarked that, "We are nearly ready to take the dredger to Pearl Harbor," and that Mr. Campbell said nothing as to the safety of taking the dredger there. Mr. Agassiz also testified that Mr. Campbell knew that they were getting the dredger ready to take to Pearl Harbor, and that they had been for two or three weeks, although he does not state how Mr. Campbell knew this. The failure of a very sick assistant superintendent to raise objections to a friendly caller at his home to a mere casual remark as to what the caller was nearly ready to do could hardly operate as an estoppel against the Territory. It does not appear what authority, if any, Mr. Campbell had in the matter. He may have supposed either that Mr. Boyd had made arrangements for taking the dredger to Pearl Harbor or that when Mr. Agassiz got ready to take her there he would before doing so first complete the conditional arrangements already made with Mr. Boyd. Mr. Agassiz knew as well as Mr. Campbell could have known the arrangements with Mr. Boyd and Mr. Campbell may not have known them at all. Certainly Mr. Agassiz was not seeking Mr. Campbell's

consent as a basis for his action, nor had Mr. Campbell any reason to suppose that Mr. Agassiz would act on his silence. It is said further that Mr. Campbell must have known that the dredger was taken to Pearl Harbor after it was taken there and that he made no objections. If such knowledge can be inferred from the supposed publicity or notoriety of the act, it still would not follow that Mr. Campbell's failure to object would relieve the defendants. The latter had full knowledge of all the circumstances and were in a better position than Mr. Campbell to know whether they were acting rightly or not and they could not reasonably claim and do not claim that they were induced by the silence of that sick man, and it would be the same if he were well, to take the dredger to Pearl Harbor or to keep her there afterwards. They took their chances with full knowledge and cannot say that they were justified in performing negligent acts, if they did so, merely because Mr. Campbell did not follow them about and tell them they ought not to perform such acts.

It is contended further that since the original contract did not specify where the dredger was to be used the defendants had a right to use it at the entrance to Pearl Harbor, or at least that such was the law of the case whether right or wrong as given in defendants' requested instruction 3 as follows: "This agreement allowed the defendants 'the use of the government suction dredger' without confining the place of use to any particular locality. Using the dredger for dredging out the entrance of Pearl Harbor may be presumed to have been contemplated by both parties, consequently the defendants are not necessarily chargeable with negligence by the mere fact of using the dredger at that place, whether the plaintiff expressly agreed that it might be used there or not." As matter of fact the jury might well have found that the parties did not contemplate the use of the dredger at the entrance to Pearl Harbor. The dredger was not a seagoing dredger and had always been used in the harbor of Honolulu, although she was once taken a short distance outside for a day or so, where she was found

unserviceable because of the swell. She was hired by the defendants apparently with special reference to dredging a portion of that harbor, and the defendants themselves when they first contemplated using her at the entrance to Pearl Harbor six or seven months afterwards seemed to think that they required the permission of the superintendent of public works to do so. As Mr. Agassiz testified, he would not take over the Pearl Harbor "job until I got permission to use the dredger on Pearl Harbor. * * * I didn't expect to take it down there without getting permission from Mr. Boyd or some one else in authority; I was not going to sneak the dredger out of the harbor." The instruction of the court must be construed as laying down a rebuttable and not a conclusive presumption as to the use of the dredger at Pearl Harbor. Such construction is perhaps required in order to harmonize the instruction with other instructions that were given. Moreover, the trial judge could hardly have intended to go to the ridiculous extent of saying that because the contract did not expressly confine her place of use to any particular locality the dredger could be used anywhere else however remote or however dangerous the conditions, and he expressly refused to give the instruction in its original form as requested by the defendants, which might have made the presumption conclusive, and modified it by inserting the word "necessarily," which shows that he intended the presumption to be rebuttable. One of the defendants' exceptions was taken to this modification. The plaintiff offered to show a contemporary oral agreement that the dredger was to be used in the harbor of Honolulu only, but this was excluded.

But let us assume that the defendants had a right under their original contract to take the dredger to Pearl Harbor and use her there or, if not, that it was not negligence even if it were a breach of contract to take and use her there, or that the plaintiff through its officers not only knew that the dredger was to be taken or was taken there but even expressly consented and that unconditionally that she might be taken and used there. Still, there would be no estoppel except as to taking and using

her there.  There would be no estoppel against setting up negligence in keeping her on the bar in an unprotected condition during rough weather.  Permission to take and use her there would not include permission to do so negligently.  For instance, permission to take her there would not estop the plaintiff from setting up negligence or claiming damages if she had been lost in an attempt by the defendants to take her there in a severe storm.  No more would there be an estoppel by reason of permission to use her there, if she were lost through their negligence in improperly mooring her or in not protecting her by necessary bulkheads or copings or in keeping her there in a severe storm.  The defendants contend that she was properly moored there and as to that the plaintiff raises no question.  The main question is whether it was negligence to keep her where she was under the stormy conditions that prevailed when she was lost.  It does not follow that, as contended, because there was no negligence in mooring her as she was moored and in the place where she was moored and in calm weather on October 30, it was safe and prudent to allow her to remain there during a gradually increasing wind and swell from the ocean.  The defendants take the strange position that if it was safe and prudent to place the dredger where she was at the time and under the conditions then prevailing no negligence can be imputed to them for leaving her there under changed conditions because they had no available means of removing her from that position—the tug Fearless being too large to cross the bar, the tug Kaena being too small to handle the dredger in weather that was at all rough, there being no other available tug capable of taking the dredger into Pearl Harbor in rough weather, and it being unsafe for the Fearless to take her in such weather back to Honolulu Harbor.  This is an argument that it would not be negligent to place the dredger in a position that might reasonably be expected to become dangerous at any time, without providing also the means for removing her from that position and taking her to a place of safety when the danger should arise.  The jury were

instructed in substance that if the defendants negligently put the property into circumstances of such difficulty or peril as to make it impossible for them to save her under those circumstances the defendants would be liable. See plaintiff's requested instruction 15. The point, however, which we wish to make now is that the defendants' right, if they had a right, whatever its source, or the plaintiff's permission, to take the dredger to the entrance of Pearl Harbor or use her there would not include a right or permission to keep her there under dangerous conditions. We shall now proceed to consider whether the evidence was sufficient to justify a finding that it was negligence to keep the dredger where she was and under the conditions existing at the time she sank, and whether that negligence, if there was any, was the proximate cause of the loss.

The defendants contend that there was no negligence in keeping the dredger there and that the loss was not due to such negligence, if there was any, but was due to possible unknown causes, which they contend the plaintiff should have negatived or excluded, or to defects in the construction of the dredger. It is true that no evidence was produced to show what took place between midnight and the time, a little more than two hours later, when the dredger sank; that the burden was on the plaintiff to show negligence on the part of the defendants; that it could not be presumed in the absence of evidence that the defendants were negligent during that time; and that the dredger, so far as the evidence shows, was in good condition and practically free from water at midnight. But it was unnecessary to show any special negligence during those two hours, and, indeed, it is difficult to imagine what the defendants could have done during that period or neglected to do which would have made any difference in the result if the loss was caused, as apparently it must have been, through the water coming over the dredger or into her from the bottom. The negligence, if any, was in placing the dredger there without providing means of taking her to a place of safety in case of danger or in keeping her there without adequate protection in

time of danger. If such negligence was shown, and especially if it was supplemented by evidence tending to show that the dredger was swamped by water coming over her, that might well be considered the proximate cause of the loss until some other sufficient intervening cause should be shown. It was not incumbent on the plaintiff to show beyond a reasonable doubt that the water did not come through the bottom owing to some latent defect in the dredger. It was sufficient to show by a preponderance of evidence that it came over the stern in consequence of the dredger having been left in a dangerous position.

The defendants attempted to show that the loss was caused or might have been caused by defects in the dredger herself which were unknown to the defendants. The only evidence tending in this direction consists of the testimony of Captain Scott of the Kaena to the effect that on the morning before the dredger sank, when he happened to go aboard her, there was shaking and the brick work about the boilers was opening and shutting about four inches, and that after the dredger sank he brought up a plank that came out of her deck. The evidence as to the plank is in itself of no significance, for not only did that come out of the deck and not out of the bottom but it came out after the dredger sank, and according to the testimony of Mr. Agassiz the upper part of the dredger began to break up under the action of the waves almost immediately after she sank. As to the brick work, the testimony of this witness might well have been disbelieved by the jury. Taken as a whole it does not make a favorable impression. The fact, if it was a fact, that the brick work was opening and shutting four inches was perhaps the most significant fact that the defendants could rely upon, and yet not one of their other witnesses alludes to it excepting Mr. Agassiz, who says he never heard of it until shortly before the trial—a year and a half after the dredger sank. Even the foreman of the dredger, Haggart, whose attention Captain Scott says he called to the condition of the brick work at the time, says nothing about it. Other things, such as the breaking of the cable, were reported

to Mr. Agassiz, and yet this, which, if true, was most important of all, was not reported to him, nor was any attention paid to it by any one so far as appears, although a number must have noticed it and realized the dangerous condition of the dredger which it indicated if it were a fact. Captain Scott, indeed, goes so far as to say substantially that that indicated to him that the dredger was breaking up, and that he knew pretty well when a vessel was breaking up—and yet it does not seem to have made any impression to speak of upon him at the time, to judge from his actions.. It is also probable that the dredger would have leaked badly if she were working so as to open and shut the brick work around the boilers four inches, and yet the defendants contend that there was little or no leaking of an unusual character up to midnight, which was the last time in regard to which there was testimony as to the condition of the dredger before she sank. Mr. Ward, the machinist and engineer who superintended the repairs of the dredger and put in the brick work, testified that it would be an impossibility for the brick work to open and shut in the manner described, because it was held by iron clamps or flanges, and that if such opening or shutting had occurred the clamps or flanges, which were riveted to the boilers, would have broken.

There was ample evidence upon which to base a finding that the defendants were negligent in keeping the dredger where she was under the existing conditions, and, if there was such negligence, the jury was justified in finding that it was the proximate cause of the loss. In the first place the dredger was fully described to the jury and from that description, as well as from the testimony of Captain Macauley, an expert, to whom the dredger was described in a hypothetical question, and who was also personally thoroughly familiar with her, having formerly operated her, the jury could not very well have found otherwise than that she "was not a sea-going dredger." It was also shown by the testimony of several witnesses that rough water might have been expected from time to time at the place where the dredger was moored and indeed that wind and water

as heavy as on the occasion in question were not infrequent at that place. . One witness, Haggart, testified also that at noon or a little earlier on the day before the dredger sank she was taking seas, and that during that afternoon she was taking water in over the deck, though not very much, although when he left at six in the evening the water was not coming over. Another, Martin, testified that, although when he retired at midnight the dredger was dry, all the water that came in having been kept pumped out, yet when he was awakened at about 2:20 he found the water in the engine room up to his knees and the sea "coming over the stern of the boat, coming all over it. * * * All the swell that came in ahead of the deck of the boat came all over the boat. * * * Too much water came over. * * * I saw the water come over the stern, when the sea is coming it came all on the deck." It is contended that because the dredger was kept practically dry up to midnight, and there is some testimony on the part of the defendants that the wind had moderated some, the water could not have come over the deck but must have come through the bottom owing to some unknown defect in the dredger, but the fact that the dredger was kept dry up to that time would seem to show more strongly still that the water could not have come through the bottom, for there was ample depth for the dredger and no likelihood of striking below, and it is improbable, or the jury might have so found, that the dredger would begin leaking suddenly so as to let in such large quantities of water. The evidence showed also that the dredger had been thoroughly repaired and was in first class condition only eight months before. The jury may have thought it more probable that she took in a large quantity of water over the stern, as the witness testified, by reason of an unusually large wave or by reason of the sea becoming rougher. One witness testified that for several days the sea grew rougher, although the wind remained about the same. The roughness of the sea, of course, did not depend entirely on the local wind. The waves, as we have seen, came square against the stern of the dredger after her position changed the

day before. Lastly, so far as the evidence on this point need be referred to, there was the testimony of the experts, Captains Macauley and Lorenzen, who replied to hypothetical questions that it would not be safe or prudent for a dredger of this description to be moored in such a place under such conditions. The defendants and the trial judge seem to think that this expert testimony was the only evidence on this question, but, as we have seen, it was not. The plaintiff's requested instruction 12 allowed the jury to find negligence from the other evidence. The effect of the expert testimony is sought to be avoided mainly on two grounds. One of these is that the hypothetical question omitted the essential fact that there was a coping sixteen inches high around the house of the dredger to protect her from the seas washing over the decks. It is not apparent or probable that this would have made any difference in the answers of these experts. Captain Macauley also says that he saw the dredger just before she was taken to Pearl Harbor; he was also familiar with her and it does not appear that the coping was put on after he became familiar with her. This witness also says that "the main fact of her being unsafe there was that she was not a sea-going dredger, and you are always in danger of being swamped by a heavy sea." It is true a special bulkhead had been erected on deck just before the dredger was taken to Pearl Harbor, but it was only across the front just behind the ladder, and of course could afford no protection when the dredger had her stern to the waves. Indeed, we may add in passing, that failure to put a bulkhead all around her when she might part some of her cables and swing around at any time or failure to erect a bulkhead across the stern when she did swing around or failure to haul her back to her original position with bow to the waves, might well be regarded as negligence independently of keeping her on the bar in rough weather. The fact that the defendants used two other dredgers in the same locality is of little importance. They were constructed differently and were apparently better protected from the waves. At most it was a question for the jury. The other

contention in regard to the expert testimony is substantially that it begged the question. The hypothetical question, after setting forth the assumed facts, was as follows: "Assuming these facts to be true, with your experience would you say it was safe or prudent for a dredger such as I have described to be moored in such a place under such conditions?" Captain Macauley's answer was, "Decidedly not." The defendants contend, quoting from the opinion of the trial judge, that "the question might as well have been: * * * 'the dredger having parted her moorings in the storm and having sank and been lost, was she safely and prudently moored?' or, 'having sank was she safe?'" and that "only a fool or a knave could answer such a question in the negative" (affirmative), and consequently that the answer amounts to nothing. ·The question was admitted by the court and not objected to by defendants' counsel. The statement of the assumed facts may not be above criticism but it was not objected to. It need not have referred to the loss of the dredger, but Captain Macauley said that it would not have made a particle of difference in his answer if it had been found that the dredger had not been swamped by water coming over her side or stern. He knew also that she had sunk irrespective of the statement in the hypothetical question. The question, however, was not in substance, as contended, whether the dredger was safely and prudently moored or whether she was safe, but whether it was safe *or* prudent for her to be moored as described. It was unnecessary to put it in the form in which the defendants and the circuit judge contend it should have been put, namely, whether the mooring of the dredger as described was such an act as an ordinarily careful and prudent man would exercise as to his own property under similar circumstances. The form used is a common form. See *Transportation Line v. Hope,* 95 U. S. 297; *Union Insurance Co. v. Smith,* 124 U. S. 405, 423. Nor can refuge be taken, as is attempted, in Captain Macauley's statements that "it was a prudent thing to moor her where she was moored in fine weather" and that "she was moored all right as I understand

it." The question was not whether it was prudent to moor her there in fine weather but whether it was safe for her to be moored there under the described conditions, that is, the conditions that existed when she sank. The captain makes himself clear in his statements taken as a whole when he says it would be a prudent thing to moor her where she was moored "in fine weather, but very imprudent to keep her there in bad weather;" and when he says in answer to the next question, "No matter what kind of moorings?" "The better the mooring the longer she stayed there, she was moored all right as I understand it;" and in answer to the next question, "The longer she would stay under or above the water?" "The seas coming over, it was a matter of time when she would fill and sink to the bottom; she would fill up and certainly go to the bottom;" and in answer to the next question, "It would not make any difference about the moorings?" "Not a bit; the moorings would hold her there;" and when he says, "I cannot see any reason for keeping her there," and that it would be a proper course to pursue upon the springing up of southerly weather "to bring her into a safe harbor" and that "Pearl Harbor was a safe harbor near there." These statements alone, irrespective of the answers to the long hypothetical question, are sufficient in themselves; and the argument that according to these statements the only act, if any, that was negligent was in keeping the dredger there in rough weather, and that that was not negligent because there was no available means of taking her to a place of safety in such weather has already been answered by showing that it was negligent to put the dredger in a palpably dangerous position without providing means for taking her out of that position when danger approached. As well might it be argued that because it would be prudent to moor her in calm weather with, say, two cables, it would not be negligent to leave her moored so in rough weather because there were no other cables available and no precautions had been taken to have sufficient cables for such weather as might reasonably be expected.

It is contended also that the evidence does not justify a verdict for so large a sum as $25,000 (1) because there was no direct evidence as to the value of the dredger at the time she was lost, and (2) because portions of the property sued for to the value of $10,800 were returned. The evidence shows that the cost of the dredger when new, 16 or 17 years ago, was $65,000; that in 1901 her value was about $20,000; that repairs to the extent of $26,000 were then made, and that in the following year, 1902, immediately before the defendants took over the dredger, about $10,000 was expended in repairs and new machinery; that she was in first-class order and worth $45,000 when the defendants took her over eight months before she sank, during which period she had been used in the quiet harbor of Honolulu. There was no evidence of any special deterioration during that period, and she was apparently considered by the defendants as in sufficiently good order for extensive use in the comparatively rough water of the Pearl Harbor bar. It is true that the bond for her return in good working order was for only $10,000, but that is of little significance. There was an obligation to return her irrespective of the bond, and additional security to the amount of $10,000 might well have been deemed sufficient to cover any damages from causes other than fire that might occur in the harbor of Honolulu. Of more significance is the provision in the contract that she was to be kept insured to the amount of $20,000 against loss or damage by fire, which would indicate that her value was regarded as of a greater amount. There is nothing to indicate that she deteriorated from a value of $45,000 to a value of less than $25,000 in the eight months of her use by the defendants in the harbor of Honolulu or that she was in a bad condition at all when she was lost. Evidence that the defendants obtained marine insurance to the amount of $20,000 on her when they took her to Pearl Harbor was excluded. The evidence was sufficient to justify a finding that her value was $25,000 at the time she sank, without any direct evidence, which would naturally be in the form of opinion evidence, as to her value at

the time she was lost, and the trial judge so held on the motion for a new trial. And yet there was such direct evidence, and that from one of the defendants' own witnesses. Captain Parker, who had had much to do with dredgers, and was familiar with this one at the time she was lost, testified: "I could duplicate—rather build a machine with the same capacity, just as good a machine in my estimation, for $25,000." As to the portions of the property returned, they were not taken to Pearl Harbor at all,—with the exception of the pontoons, which were not a part of the dredger. The complaint alleges that the dredger and other property was hired to the defendants, that the dredger was reasonably worth $25,000,. and that by reason of the failure of the defendants to return the dredger and machinery described in the contract the plaintiff was damaged in the sum of $25,000. The evidence already referred to applies in large measure to the dredger alone and not to these other things. For instance, Captain Parker's testimony just quoted was given in reply to a question in regard "to the dredger which was sunk in the condition it was in." No claim for damages was made by the plaintiff for the portions of the property that were returned.

The exceptions are overruled.

*E. C. Peters, Attorney General,* for the plaintiff.

*S. H. Derby (Kinney, McClanahan & Derby* on the brief) for the defendants.

*(Not heretofore reported.)*

## EX PARTE THURSTON.

HABEAS CORPUS.

SUBMITTED MAY 29, 1901.                    DECIDED JUNE 12, 1901.

BEFORE FREAR, C. J., AT CHAMBERS.

The petitioner, having refused as a witness to answer certain questions put to him by the grand jury in the circuit court of the first circuit, was ordered by the court to appear and show cause why he should not be required to answer such questions. He made a showing which the court held insufficient in law as to one of the questions asked, namely, as to the name of a client of his. He contended that he was privileged from answering this on the ground that to do so would be a violation of his confidential relation as attorney to his client. The mittimus, which is set forth in the return, after reciting the proceedings at length, continues: "And the said L. A. Thurston being then and there by the court ordered and directed to appear before the grand jury and furnish to it in response to its interrogatory the name of his alleged client, and the said L. A. Thurston then and there in open court declining to do so,

"It is ordered and adjudged that the said L. A. Thurston be and he is hereby fined in the sum of one hundred dollars;

"And it is further ordered and adjudged that said L. A. Thurston be and he is hereby committed to prison until such time as he shall express his willingness to appear before the said grand jury and answer the interrogatory aforesaid, to wit: to disclose the name of his alleged client," &c.

It appears that the petitioner declined to answer a certain question and that thereupon the court sentenced him to pay a fine and suffer imprisonment. It nowhere appears that the petitioner was convicted of contempt. A person cannot lawfully be

sentenced for the commission of an offense until he has been duly convicted or found guilty of the offense. It may be perfectly clear from the evidence in a criminal case tried before a jury that the defendant has committed a certain offense, but the court cannot sentence him for it until the jury have rendered a verdict of guilty against him. · It is equally true that the court cannot in a criminal case heard or tried by itself pronounce sentence until it has found the defendant guilty. A contempt such as it is contended the petitioner committed is a criminal offense and no sentence can be pronounced until after conviction in such a case any more than in other criminal cases. The mittimus does not show that the petitioner was convicted of any offense, nor does it show of what offense he was convicted, if he was convicted of any offense.

In *Ex parte Adams,* 25 Miss. 892, the court "Ordered that George H. Adams be sent to jail, and remain there until he signifies his assent to the court to answer questions to the grand jury, or until final adjournment of said grand jury at this term of court." On habeas corpus before a justice of the high court of errors and appeals, the following language, quoted in Church, Hab. Corp., Sec. 332, was used: "But it is clear that a general order to imprison a party unless he has been convicted either by a jury or by the court is a mere nullity. The law requires that before a sentence of imprisonment shall be passed against a party, he should first be convicted of an offense. In ordinary cases, this conviction must be by the verdict of a jury. In the case of contempts, it may be by the judgment of the court. Still, in either case, the record must show a conviction. Now it will be seen from this return that there is no judgment of imprisonment for a contempt generally, or for a contempt in refusing to answer questions. There is not any conviction or adjudication by the court that Mr. Adams had been guilty of a contempt. Without such judgment the court had no right to commit him to prison, nor the sheriff to detain him. It is true and was admitted on the argument, that Mr. Adams did refuse to answer questions asked by the grand jury, and it may be

true that the court considered that a contempt for which he deserved imprisonment, but no such judgment has been rendered in the case; and however many contempts the prisoner may have committed, it is not lawful to imprison him until convicted thereof by the judgment of the court, which judgment and conviction must appear by the record."

See also *Privett v. Pressley,* 62 Ind. 491; *Ex parte O'Brien,* 127 Mo. 477; *People v. Bennett,* 4 Paige 282; *In re Blair,* 4 Wis. 522; *Sherwood v. Sherwood,* 32 Conn. 1; *People v. Cavanagh,* 1 Parker Cr. R. 588.

*A. S. Hartwell* and *Kinney, Ballou & McClanahan* for the petitioner.

*F. E. Thompson* for the respondent.